2013 COA 150

THE TRIPLE CROWN AT OBSERVATORY VILLAGE ASSOCIATION, INC., a Colorado nonprofit corporation, Plaintiff–Appellant,

v.

VILLAGE HOMES OF COLORADO, INC., a Colorado corporation; Peter Benson; Brian Graves; Mark McCallum; Rudy Hansch; Kelly Martinez; Ronald Hettinger; and Elyssa Blazier, Defendants–Appellees.

Court of Appeals No. 13CA1390

Colorado Court of Appeals, Div. A.

Announced November 7, 2013

As Modified on Denial of Rehearing December 5, 2013

Sullan[2], Sandgrund, Perczak & Nuss P.C., Scott F. Sullan, Mari K. Perczak, David B. Shaw, Denver, Colorado, for Plaintiff–Appellant.

McConaughy & Sarkissian, P.C., Ivan A. Sarkissian, Christopher J. Metcalfe, Englewood, Colorado, for Defendants–Appellees.

Opinion by JUDGE WEBB

¶ 1 Arising from alleged construction defects in a common interest community, this interlocutory appeal under C.A.R. 4.2 [1] presents four questions of first impression in Colorado: (1) whether the time limit for approving actions taken without a meeting by a unit owners' association, as defined in section 38–33.3–103(3) of the Colorado Common Interest Ownership Act (CCIOA), sections 38–33.3–101 to –319, C.R.S.2013, and formed as a nonprofit corporation under the Colorado Revised Nonprofit Corporation Act (CRNCA), sections 7–121–101 to 7–137–301, C.R.S.2013, is governed by CCIOA or the CRNCA; (2) whether an association has a right under CCIOA section 38–33.3–302(1)(d) to initiate a judicial proceeding, notwithstanding a mandatory arbitration provision in its declaration; (3) whether CCIOA section 38–33.3–302(2) invalidates such a mandatory arbitration provision as to claims by an association against a declarant, as defined in CCIOA section 38–33.3–103(12); and (4) whether claims under the Colorado Consumer Protection Act (CCPA), sections 6–1–101 to –1001, C.R.S.2013, can be made subject to

---

1. *See The Triple Crown at Observatory Village Ass'n, Inc., v. Vill. Homes of Colo., Inc.,* 2013 COA 144, —— P.3d ——, 2013 WL 5761028 (accepting petition for interlocutory review).

a mandatory arbitration provision in a declaration.

¶ 2 We decide these questions as follows:

(1) Where an association is a nonprofit corporation, the CRNCA establishes the time limit for amending its declaration based on action taken without a meeting;

(2) The statutory power to engage in "litigation" under CCIOA section 38–33.3–302(1)(d) includes arbitration;

(3) CCIOA section 38–33.3–302(2) does not invalidate the mandatory arbitration provision, because the dispute resolution procedures apply to parties other than the declarant; and

(4) CCPA claims may be subject to mandatory arbitration, because the CCPA does not include a nonwaiver provision.

¶ 3 Therefore, we affirm the trial court's order concluding it lacked jurisdiction, and remand for further proceedings.

## I. Facts and Procedural Posture

¶ 4 Triple Crown at Observatory Village (Triple Crown) is a common interest community organized under CCIOA section 38–33.3–103(8). The developer of Triple Crown, Village Homes of Colorado, Inc., (Village Homes) was Triple Crown's declarant under section 38–33.3–103(12). As the declarant, Village Homes drafted and recorded the 2004 Declaration of Covenants, Conditions and Restrictions of Triple Crown (Declaration).

¶ 5 In the Declaration, Village Homes created Triple Crown at Observatory Village Association, Inc. (Association). The Association is a unit owners' association under CCIOA section 38–33.3–103(3). It was organized as a nonprofit corporation under the CRNCA.

¶ 6 Article 14 of the Declaration provided dispute resolution procedures for various claims, including claims between the Association and any party regarding the design or construction of Triple Crown and claims arising from statements or representations made by Village Homes or its agents. Under Article 14, when such a dispute arose, the parties were required to (1) submit a formal claim, (2) engage in good faith negotiations, (3) submit a notice of claim, (4) engage in media-

tion under the auspices of the American Arbitration Association (AAA), and (5) if necessary, resolve the dispute through arbitration under AAA rules.

¶ 7 On January 14, 2012, the Association began collecting votes from its members to revoke Article 14. After sixty days, forty-eight percent of the members had cast votes in favor of revocation. After another sixty days, the Association had obtained the required sixty-seven percent of votes to revoke Article 14.

¶ 8 The Association then recorded an amendment to the Declaration revoking Article 14. Shortly thereafter, the Association brought this action against Village Homes and several of its principals and employees (collectively, Respondents), alleging negligent construction, CCPA violations, and breach of fiduciary duties.

¶ 9 Respondents moved to compel arbitration based on the trial court's lack of jurisdiction, citing Article 14. They argued that because the Association had not amended Article 14 within the time limits in the CRNCA, the parties were still bound to Article 14's dispute resolution procedures, including mandatory arbitration. The trial court granted Respondents' motion, concluded it lacked jurisdiction, and ordered the parties to follow Article 14.

## II. Standard of Review

¶ 10 Questions of statutory interpretation are reviewed de novo. *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo. 2005). Because a court's primary duty is to give full effect to the General Assembly's intent, interpretation begins by examining the statute's plain language within the context of the statute as a whole. *Bd. of Cnty. Comm'rs v. Hygiene Fire Protection Dist.*, 221 P.3d 1063, 1066 (Colo.2009). "Words and phrases should be given effect according to their plain and ordinary meaning." *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991). The court "must not strain to give language other than its plain meaning, unless the result is absurd." *Colo. Dep't of Soc. Servs. v. Bd. of Cnty. Comm'rs*, 697 P.2d 1, 18 (Colo.1985). If the plain meaning is

clear, the statute is applied as written. *Wells Fargo Bank v. Kopfman,* 226 P.3d 1068, 1072 (Colo.2010).

¶ 11 The absence of particular language is usually considered an indication of legislative intent, not a mere oversight. *Specialty Restaurants Corp. v. Nelson,* 231 P.3d 393, 397 (Colo.2010). Courts interpret statutes to avoid absurd or illogical results, and "strive to interpret statutes in a manner that avoids rendering any provision superfluous." *Qwest Corp. v. Colo. Div. of Prop. Taxation,* 2013 CO 39, ¶ 16, 304 P.3d 217. Interpretations that conflict with the Colorado Constitution should be avoided. *Hall v. Walter,* 969 P.2d 224, 229 (Colo.1998).

¶ 12 Where two statutes address the same subject, both statutes are construed together; the court seeks to avoid inconsistencies and reconcile conflicts. *Hygiene Fire Protection Dist.,* 221 P.3d at 1066. But if a conflict arises, specific provisions usually control over general provisions. *City & Cnty. of Denver ex. rel. Bd. of Water Comm'rs v. Bd. of Cnty. Comm'rs,* 782 P.2d 753, 766 (Colo. 1989). Further, where a statute is specifically incorporated by reference, amendments to that statute made after the original enactment are deemed incorporated if the General Assembly expressly or by strong implication shows that it intended to incorporate the later amendments. *Curtis Ambulance of Fla., Inc. v. Bd. of Cnty. Comm'rs,* 811 F.2d 1371, 1378–79 (10th Cir.1987); *see also* 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 51:8 (7th ed. 2007).

¶ 13 Courts presume that the General Assembly knew and considered relevant judicial precedent when it enacted legislation. *People v. O'Donnell,* 926 P.2d 114, 115 (Colo. App.1996). This is true "[e]ven in the absence of demonstrative legislative history." *Rauschenberger v. Radetsky,* 745 P.2d 640, 643 (Colo.1987).

### III. Where an Association Is a Nonprofit Corporation, the CRNCA's Sixty–Day Time Limit Controls the Time Allotted to Amend Declarations Without Meetings Under CCIOA

¶ 14 The trial court held that when a nonprofit unit owners' association amends its declaration without a meeting under CCIOA section 38–33.3–217(1)(a)(I), the association must comply with the sixty-day time limit provided in CRNCA section 7–127–107. Because the Association did not comply with the CRNCA's sixty-day requirement, the court held that the amendment repealing Article 14 was ineffective. We agree.

¶ 15 CCIOA provides that each unit owners' association must be organized "as a nonprofit, not-for-profit, or for-profit corporation or as a limited liability company." § 38–33.3–301. Thus, the type of organization the declarant selects determines which corporate law will supplement CCIOA. *See* § 38–33.3–108 (referencing "the law of corporations"). However, provisions of the Colorado corporate statutes that conflict with CCIOA will not override it. § 38–33.3–319.

¶ 16 Imposing the CRNCA time limit on actions taken without meetings does not impair the substantive rights of unit owners' associations. *See* § 38–33.3–301 ("Neither the choice of entity nor the organizational structure of the association shall be deemed to affect its substantive rights and obligations under this article."). Instead, reading the statutes together to avoid conflicts, the CRNCA's time limit for actions without meetings merely provides a procedure to implement such associations' substantive right to amend their declarations.

¶ 17 Nevertheless, here, the Association argues that the General Assembly intended associations to have an indefinite time in which to vote without a meeting on declaration amendments, because the absence of a time limit in CCIOA should be recognized as intentional. The Association has not cited, nor have we found in Colorado, a case applying this principle where one statute incorporates the terms of another by reference. Instead of dictating the specific procedures that must be followed in amending declarations, CCIOA incorporates Colorado corporate law by reference. §§ 38–33.3–108, 38–33.3–218, 38–33.3–319. On this basis, the Association's citations are distinguishable.[2]

¶ 18 The Association also argues that the General Assembly is presumed to have known that the CRNCA's predecessor, which applied to nonprofit corporations when CCIOA was adopted, did not impose a time limit on actions without meetings. Colorado Nonprofit Corporation Act, § 7–23–110, C.R.S., *repealed by* 1997 Colo. Sess. Laws, S.B. 97–91, § 1. Thus, according to the Association, the General Assembly did not intend for one to be imposed thereafter. But the General Assembly is also presumed to have known of amendments to the CRNCA, including the sixty-day time limit on actions without meetings, when it incorporated the revised statute by reference into CCIOA. *See* 1997 Colo. Sess. Laws S.B. 97–91 (amending law of corporations referenced in CCIOA to include the CRNCA in the place of its predecessor).

¶ 19 Further, the differences in the corporate structures available to associations support the interpretation that the General Assembly intended the laws of the chosen corporate structure to supplement CCIOA's terms. *Compare* CRNCA, § 7–127–107, C.R.S.2013 (procedures for actions without meetings for nonprofit corporations requiring members' votes), *with* Colorado Business Corporation Act, § 7–108–202, C.R.S. 2013 (procedures for actions without meetings taken by directors of for-profit corporations). To nevertheless conclude that the General Assembly intended declaration amendment voting time frames to be of indefinite duration would ignore the differences between associations that have directors and those that do not. *Cf.* § 38–33.3–102(1)(c) ("[I]t is the policy of this state to give developers flexible development rights.").

¶ 20 Therefore, we conclude that nonprofit unit owners' associations are bound by the CRNCA's sixty-day time limit when they seek to amend declarations without a meeting. Accordingly, because the Association did not comply with this limit, the attempt to remove Article 14 from the Declaration was ineffective.

IV. The Statutory Power to Engage in "Litigation" under CCIOA Section 38–33.3–302(1)(d) Includes Arbitration

¶ 21 CCIOA establishes the power of unit owners' associations to "[i]nstitute, defend, or intervene in *litigation* or administrative proceedings ... on matters affecting the common interest community." § 38–33.3–302(1)(d) (emphasis added). The trial court interpreted "litigation" to include both judicial proceedings and arbitrations. Thus, it held that the mandatory arbitration provision did not infringe on the Association's statutory power to "[i]nstitute ... litigation." Although the question is close, we agree with the trial court.

¶ 22 CCIOA does not define "litigation." *See* § 38–33.3–103. Nor does the Uniform Common Interest Ownership Act (Uniform Act), on which CCIOA is based. *See* Uniform Act, § 1–103 (2008); *Giguere v. SJS Family Enters., Ltd.,* 155 P.3d 462, 467 (Colo.App.2006) (explaining CCIOA was based on the Uniform Act). Thus, "where the legislature has not expressly defined a statutory term or otherwise limited its meaning, that term must be given its ordinary meaning." *Marquez v. People,* 2013 CO 58, ¶ 8, 311 P.3d 265, 2013 WL 5309235.

¶ 23 No Colorado case has addressed the ordinary meaning of "litigation." *See Estate*

**2.** In *Romer v. Board of County Commissioners,* 956 P.2d 566, 576 (Colo.1998), the supreme court found the absence of language providing counties with a right to judicial review in district court under the Colorado Human Services Code, § 26–1–126, C.R.S.1997, was intentional, because of its contrast to the explicit creation of such a right elsewhere in the code. In *Specialty Restaurants Corp. v. Nelson,* 231 P.3d 393, 402 (Colo.2010), citing *Romer,* the court held that because the General Assembly did not include an effective date in certain amendments to the Colorado Workers' Compensation Act, § 8–43–406, C.R.S.2007, as it had in all previous amendments, the amendment applied regardless of the date of the employee's injury. Unlike the Colorado Worker's Compensation Act and the Colorado Human Services Code, CCIOA directly references the CRNCA as supplementing the provisions governing unit owners' associations that choose to be organized as nonprofit corporations. *Compare* Colorado Human Services Code, § 26–1–101 to –501, C.R.S.2013, *and* Colorado Workers' Compensation Act, § 8–43–101 to –607, C.R.S.2013, *with* CCIOA, § 38–33.3–108.

*of Keenan v. Colo. State Bank & Trust*, 252 P.3d 539, 545 n. 2 (Colo.App.2011) (stating "[t]he term 'litigation' is broadly defined," but not providing a definition). Colorado courts often look at dictionaries to interpret undefined statutory terms. *See, e.g., People v. Gallegos*, 2013 CO 45, ¶ 12, 307 P.3d 1096 (quoting *Black's Law Dictionary* for definition of a legal term and describing it as "[t]he leading legal dictionary"); *Marshall v. People*, 2013 CO 51, ¶ 21, 309 P.3d 943 (quoting *Webster's Third New International Dictionary* for undefined statutory term). *But see Marquez*, ¶ 8 ("[E]ven a dictionary definition broad enough to encompass a particular sense of a word does not establish that the term is *ordinarily* understood in that sense." (citation omitted)).

¶ 24 "Litigation" has been defined as "[t]he process of carrying on a lawsuit" or as "[a] lawsuit itself." *Black's Law Dictionary* 1017 (9th ed. 2009); *see Mercantile Adjustment Bureau, L.L.C. v. Flood*, 2012 CO 38, ¶ 23, 278 P.3d 348 (referencing the *Black's Law Dictionary* definition of litigation but not expanding on it). A "lawsuit" is a proceeding by a party against another in a court of law. *See Black's Law Dictionary* 1572. By contrast, an "alternative dispute resolution" proceeding is "a procedure for settling a dispute by means *other than litigation*, such as arbitration or mediation." *Id.* at 91 (emphasis added); *see also Melssen v. Auto-Owners Ins. Co.*, 2012 COA 102, ¶ 28, 285 P.3d 328 (quoting definition with approval).

¶ 25 "Litigation" has also been defined as "the act or process of litigating," or "the practice of taking legal action." *Webster's Third New International Dictionary* 1322 (2002). In turn, to "litigate" is "to make the subject of a lawsuit," which is defined as "a case before a court" or "any of various technical legal proceedings (as an action, prosecution)." *Id.* at 1280, 1322.

¶ 26 Under these definitions, "litigation" does not include arbitration. At least one court has adopted this narrow definition, holding that " 'litigation' is unambiguous ... [and its] 'ordinary and popular sense' does

not include arbitration." *SDR Capital Mgmt., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 320 F.Supp.2d 1043, 1047 (S.D.Cal.2004) (citations omitted) (holding insurance contract's prior litigation exclusion does not include prior arbitration).

¶ 27 In contrast, for purposes of the work-product doctrine, "litigation" includes "civil and criminal trial proceedings, as well as adversarial proceedings before an administrative agency, *an arbitration panel* or a claims commission, and *alternative-dispute-resolution proceedings* such as mediation or mini-trial." Restatement (Third) of Law Governing Lawyers, § 87, cmt. h (2000) (emphasis added). Several courts have taken this approach to attorney work-product. *See, e.g., Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 52 (D.D.C.2009); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 147 (D.Mass.2004); *Samuels v. Mitchell*, 155 F.R.D. 195, 200 (N.D.Cal.1994).

¶ 28 This split in authority shows that "litigation" could reasonably have two different meanings, one including arbitration and one excluding arbitration. Thus, we conclude that "litigation," as used in CCIOA, is ambiguous. *See, e.g., State v. Nieto*, 993 P.2d 493, 500–01 (Colo.2000).

¶ 29 In light of this ambiguity, we begin with the statute as a whole. *See Bd. of Cnty. Comm'rs v. Costilla Cnty. Conservancy Dist.*, 88 P.3d 1188, 1192 (Colo.2004). To the extent applicable, "we may [also] consider the objective the legislature sought to attain, the legislative history, legislative declarations or purposes, and the consequences of a particular construction."[3] *People In Interest of O.C.*, 2013 CO 56, ¶ 15, 308 P.3d 1218; *see also Marquez*, ¶ 8 (endorsing "considerations, like context and purpose," and "harmon[y] with the other provisions and purpose of that scheme").

¶ 30 The purpose of enumerating broad powers in section 38–33.3–302 is to ensure that associations will be able to address all issues which may arise in governing a common interest ownership community.[4] *See*

---

**3.** Neither party has cited any legislative history.

**4.** Not only are the listed powers expansive, but they include "any other powers conferred by the declaration or bylaws" and "all other powers

§ 38–33.3–302(1)(q) (recognizing that associations' powers include "any other powers necessary and proper for the governance and operation of the association"). The power to engage in some form of mandatory dispute resolution is essential to effective governance. Thus, limiting associations' power by precluding mandatory arbitration would not further their ability to govern. To the contrary, such a restrictive view would frustrate the General Assembly's intent that CCIOA "promote effective and efficient property management through defined operational requirements that preserve flexibility for such homeowner associations." § 38–33.3–102(1)(d).

¶ 31 This broader meaning also finds some support in the General Assembly's 2007 addition to CCIOA of section 38–33.3–124(1)(a)(II) to "endorse[ ] and encourage[ ] associations . . . [and] declarants . . . to make use of . . . alternative dispute resolution." In making this change, the General Assembly did not revise section 38–33.3–302(1)(d) to add engaging in alternative dispute resolution to associations' enumerated powers. Thus, if unit owners' associations' powers under section 38–33.3–302(1)(d) were limited to judicial proceedings, an association could not adopt mandatory alternative dispute resolution procedures. As a result, despite the encouragement to engage in alternative dispute resolution, such procedures could occur only when agreed to by an association and its adversary. Hence, the canon that statutory provisions which seemingly conflict should be construed to give effect to both, *Bd. of Cnty. Comm'rs v. Bainbridge, Inc.*, 929 P.2d 691, 698 (Colo.1996), also favors interpreting "litigation" in section 38–33.3–302(1)(d) to include arbitration.[5]

¶ 32 Further, CCIOA section 38–33.3–114(2) provides, "[a]ny right or obligation declared by the article is enforceable by judicial proceeding." The use of "judicial proceeding" suggests that the choice of "litiga-tion" in section 38–33.3–302(1)(d) had a broader meaning than "judicial proceeding." "[T]he use of different terms signals an intent on the part of the General Assembly to afford those terms different meanings." *Carlson v. Ferris,* 85 P.3d 504, 509 (Colo. 2003).

¶ 33 Comparing section 38–33.3–104 and section 38–33.3–302(1) disfavors using the former to void a mandatory arbitration provision in a declaration. Section 38–33.3–104 provides "rights conferred by this article may not be waived," but section 38–33.3–302(1) lists "powers," not "rights," which an association "may" exercise, "subject to the provisions of the declaration." This phrase suggests that a declaration may limit an association's enumerated powers. *See* Uniform Act, § 3–102, cmt. 1 ("This section permits the declaration, subject to the limitations of subsection (b), to include limitations on the exercise of any of the enumerated powers.").

¶ 34 Including arbitration within "litigation" also aligns with the state's public policy, because "[i]n Colorado, arbitration is a favored method of dispute resolution. . . . Our constitution, our statutes and our case law all support agreements to arbitrate disputes." *Peterman v. State Farm Mut. Auto. Ins. Co.,* 961 P.2d 487, 493 (Colo.1998). When CCIOA was passed in 1991, "it ha[d] long been the policy of this state to foster and encourage the use of arbitration as a method of dispute resolution." *Judd Constr. Co. v. Evans Joint Venture,* 642 P.2d 922, 924 (Colo.1982). Interpreting "litigation" to preclude mandatory arbitration could create tension with article XVIII, section 3 of the Colorado Constitution, which should be avoided. *See* Colo. Const. Art. XVIII, § 3 ("It shall be the duty of the general assembly to pass such laws as may be necessary and proper to decide differences by arbitrators. . . .").

¶ 35 In addition, interpreting the power to engage in "litigation" as precluding mandatory arbitration provisions in declarations could

that may be exercised in this state by legal entities of the same type as the association." §§ 38–33.3–302(1)(*o*), (p).

5. Because section 38–33.3–124(1)(a)(II) encourages unit owners' associations and declarants to utilize alternative dispute resolution, and the Uniform Act does not include an analogous statement, the General Assembly's failure to adopt the 2008 revisions to the Uniform Act empowering associations to initiate alternative dispute resolution mechanisms is of little consequence. *See* Uniform Act, § 3–102(a)(4).

produce unfavorable consequences. Arbitration is both "efficient" and "convenient." *Judd Const. Co.*, 642 P.2d at 924. As such, it is well suited to resolving minor disputes, like those involving architectural controls. *See, e.g., Buick v. Highland Meadow Estates at Castle Peak Ranch, Inc.*, 21 P.3d 860, 863 (Colo.2001) ("The covenants grant the [c]ommittee broad latitude in making aesthetic decisions with respect to every type of improvement."). In contrast, the expense of using judicial proceedings to resolve minor disputes could burden associations. *See* § 38–33.3–102(1)(b) (endorsing the policy of "strengthening of homeowner associations in common interest communities financially").

¶ 36 Finally, recognizing arbitration as a form of litigation is also consistent with the supreme court's application of issue preclusion to arbitration proceedings where the four-factor collateral estoppel test has been satisfied. *See Guaranty Nat'l Ins. Co. v. Williams*, 982 P.2d 306, 308 (Colo.1999); *Dale v. Guaranty Nat'l Ins. Co.*, 948 P.2d 545, 549–50 (Colo.1997). One factor is whether "the party against whom the doctrine is asserted has had a full and fair opportunity to *litigate* the issue in the prior proceeding." *Dale*, 948 P.2d at 550 (emphasis added). When concluding that arbitration met this requirement, the court recognized "arbitration gives parties a right to a hearing where they can present all evidence and raise all available defenses, as well as access to the judicial system after arbitration." *Id.*

¶ 37 Accordingly, we conclude that the Association's power to initiate "litigation" under CCIOA section 38–33.3–302(1)(d) is not infringed by Article 14's mandatory arbitration provision.

V. CCIOA Section 38–33.3–302(2) Does Not Invalidate Article 14, Because the Dispute Resolution Procedures Apply to Parties Other Than the Declarant

¶ 38 CCIOA section 38–33.3–302(2) provides that "[t]he declaration may not impose limitations on the power of the association to deal with the declarant that are more restrictive than the limitations imposed on the power of the association to deal with other persons." The Association argues that this section invalidates Article 14, because its restrictions apply to Village Homes, the declarant. The trial court rejected this argument, holding that section 38–33.3–302(2) only prohibits a declarant from limiting or imposing favorable business "dealings" on an association. We agree with the trial court's ultimate determination that Article 14 survives section 38–33.3–302(2), but interpret this section differently.

¶ 39 Section 38–33.3–302(2) corresponds to section 3–102 of the Uniform Act. Comment fourteen states that this section "prevents the declarant from imposing unique limits on the association's power to deal with the declarant," including "the extent to which a declarant may insert provisions into a declaration designed to impede the association's future flexibility and discretion in managing its affairs." Uniform Act, § 3–102, cmt. 14. Thus, the limitation imposed by CCIOA section 38–33.3–302(2) is not restricted to business dealings, as the trial court concluded. "Managing" an association's "affairs" would include initiating either litigation or alternative dispute resolution to resolve construction defects.

¶ 40 However, CCIOA section 38–33.3–302(2) forbids only restrictions unique to the declarant. Here, Article 14 is not limited to the Association's dealings with Village Homes. Instead, it controls disputes between parties, and "Party" is defined as:

> Declarant, its officers, directors, partners, members, employees and agents; the Master Declarant, its officers, directors, partners, members, employees and agents; the Association, its officers, directors and committee members; the master Association, its officers, directors and committee members; *all Persons subject to this Declaration;* any builder, its officers, directors, partners, members, employees and agents; and any Person not otherwise subject to this Declaration who agrees to submit to this Article.

Declaration, § 14.4.2 (emphasis added). Thus, Article 14's dispute resolution procedures do not violate CCIOA section 38–33.3–

302(2).[6]

¶ 41 Accordingly, we conclude that CCIOA section 38–33.3–302(2) does not preclude enforcement of Article 14.

## VI. The Association's CCPA Claims Are Subject to Mandatory Arbitration, Because the CCPA Does Not Include a Nonwaiver Provision

¶ 42 The CCPA states that its "provisions ... shall be available in a *civil action* for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed." § 6–1–113(1) (emphasis added). Based on this right to bring a "civil action," the Association argues that its CCPA claims are not subject to mandatory arbitration. The trial court rejected this argument, holding that while the CCPA contemplates actions in Colorado courts, because the statute lacks a nonwaiver provision, such a right can be waived. Then, it held that Article 14 applied to the Association's CCPA claims. We agree.

¶ 43 The CCPA does not define "civil action." *See* § 6–1–102. The Colorado Supreme Court has defined the phrase as "a proceeding on the part of one person, as actor, against another, for the infringement of some right of the first, before a court of justice, in the manner prescribed by the court or law." *Hernandez v. Downing*, 154 P.3d 1068, 1070 (Colo.2007) (citation and internal quotation marks omitted). Thus, we conclude that the General Assembly's use of the phrase "civil action" in CCPA section 6–1–113(1) provides a right to commence a judicial proceeding.

¶ 44 In arguing that this right precludes mandatory arbitration, the Association's reliance on *Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo.2007), and *Lambdin v. District Court*, 903 P.2d 1126 (Colo.1995), is unpersuasive. In both cases, the supreme court's analysis turned on the respective statutes' nonwaiver provisions. *See Ingold*, 159 P.3d at 123 (holding the nonwaiver provision of the Wrongful Withholding of Security Deposits Act, currently section 38–12–103(7), C.R.S.2013, prevents enforcing arbitration agreement); *Lambdin*, 903 P.2d at 1130 (holding the nonwaiver provision of the Colorado Wage Claim Act, currently section 8–4–121, C.R.S.2013, prevents enforcing arbitration term in employment agreement). In contrast, the CCPA does not include a nonwaiver provision.

¶ 45 Therefore, we decline to extend the reasoning of *Ingold* and *Lambdin* to the CCPA. Accordingly, we conclude that the right to a civil action provided by the CCPA does not invalidate enforcement of Article 14.[7]

¶ 46 The trial court's order is affirmed, and the case is remanded for further proceedings.

JUDGE GABRIEL concurs.

JUDGE TERRY dissents.

JUDGE TERRY dissenting.

¶ 47 For the reasons stated in my dissent in *The Triple Crown at Observatory Village Ass'n, Inc., v. Vill. Homes of Colo., Inc.*, 2013 COA 144, —— P.3d ——, 2013 WL 5761028, I believe that the division should not have—and indeed, was precluded from—accepting the petition for interlocutory review of this case under C.A.R. 4.2. *See* § 13–4–104.5, C.R.S.2013. Given my previously stated views, I do not believe it is proper for me to opine on the merits of this appeal, and I do not do so.

---

6.  The Association's reliance on *Ass'n of Apartment Owners of Waikoloa Beach Villas ex rel. Board of Directors v. Sunstone Waikoloa, LLC (Waikoloa)*, 307 P.3d 132 (Haw.2013), is misplaced. While the Hawaii Supreme Court voided the dispute resolution procedures that were unique to the association's claims against the declarant, it upheld the procedures that were not so limited. *Id.* at 160–61.

7.  Other jurisdictions have held that consumer protection act claims can be subject to arbitration. *See, e.g., Dan Wiebold Ford, Inc. v. Universal Computer Consulting Holding, Inc.*, 142 Idaho 235, 127 P.3d 138, 142–44 (2005); *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 340–41 (Ky.Ct.App.2001); *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 365–67 (Tenn.Ct.App.2001).