COLORADO COURT OF APPEALS 2016COA123

Court of Appeals No. 15CA0757
Eagle County District Court No. 09CV320
Honorable Frederick W. Gannett, Judge

_____

Arrabelle at Vail Square Residential Condominium Association, Inc.,

Plaintiff-Appellee and Cross-Appellant,

v.

Arrabelle at Vail Square LLC,

Defendant-Appellant and Cross-Appellee.

_____

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE GRAHAM
Booras and Márquez*, JJ., concur

Announced August 25, 2016

_____

Lewis Roca Rothgerber Christie LLP, Scott M. Browning, Alex C. Myers, Denver, Colorado; Zonies Law LLC, Sean Connelly, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant

Gibson, Dunn & Crutcher LLP, Gregory J. Kerwin, Robert C. Blume, M. Scott Campbell, Denver, Colorado, for Defendant-Appellant and Cross-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2015.

¶ 1     In this case interpreting provisions of the Colorado Common Interest Ownership Act (CCIOA), sections 38-33.3-101 to -402, C.R.S. 2015, we are asked to determine, among other related issues, whether a mixed-use community consisting of a hotel, retail shops, restaurants, and sixty-six condominiums is a "small planned community" under section 38-33.3-116, C.R.S. 2015, of CCIOA. We conclude it is not and, therefore, affirm the judgment of the trial court.

## I. Background

¶ 2     The Arrabelle at Vail Square is a luxury development at the base of Vail Mountain in Vail, Colorado.  Built and managed by Vail Resorts Development Company and Arrabelle at Vail Square LLC (Vail Resorts), the development (Arrabelle) includes multi-million dollar residential condominiums, a boutique hotel, restaurants, retail shops, an ice-skating rink, a spa, parking, and other amenities.

¶ 3     At the time of development, Vail Resorts recorded a plat establishing seven separate real estate parcels collectively titled "Lot 1" and "Airspace Lots A-F" at the Arrabelle.  Vail Resorts then

entered into a Reciprocal Easements and Covenants Agreement (RECA) governing those parcels and creating two lots — the Airspace Lot (which would be developed into condominiums) and the Project Lot (the remainder of the property). The RECA establishes benefits, burdens, and allocation of costs between both lots, and it regulates the use and enjoyment of both lots.

¶ 4     In pertinent part, the RECA originally contained the following two provisions:

> 18. SMALL PLANNED COMMUNITY EXCEPTION. The Parties hereby acknowledge and agree that this Agreement constitutes a "declaration" and creates a "common interest community" under CCIOA. Specifically, this Agreement creates a "planned community" under CCIOA, and not a "condominium," as those terms are defined by CCIOA. The planned community created by this Agreement contains only two lots, the Project Lot and the Airspace Lot, and is therefor exempt from CCIOA's provisions pursuant to the exemption contained in Section 38-33.3-116(2) of CCIOA for planned communities containing no more than 20 lots. The Parties acknowledge and agree that the Project Lot and the Airspace Lot will not be bound by or subject to the provisions of CCIOA, except as expressly required under CCIOA, as in effect at the date of this Agreement. In addition, the Parties acknowledge and agree that neither the Project Owner nor the Airspace Lot Owner shall be

2

deemed a "master association" within the meaning of Section 38-33.3-220 of CCIOA. Without limitation on the generality of the foregoing, the Parties acknowledge and agree that the Airspace Lot constitutes an estate above the surface within the meaning of Section 38-32-101, *et. seq.*, C.R.S., and not a condominium within the meaning of CCIOA; the Airspace Lot Owner Easements constitute the sole property interest in the Project Improvements[1] that is held by the Airspace Lot Owner as appurtenances to the Airspace Lot; and there are not any "common elements" or other portions of the Project Improvements in which the Airspace Lot Owner holds any undivided or other ownership interest.

19. CONDOMINIUMIZATION OF AIRSPACE LOT. Notwithstanding but without limiting the provisions of Section 18 above, the Parties acknowledge and agree that the Airspace Lot Owner may, at its election, subject the Airspace Lot to a condominium regime under CCIOA. Regardless of any such condominiumization, the Airspace Lot will continue to be a single lot for all purposes under this Agreement. Any owners' association formed pursuant to CCIOA (the "Association") will be deemed the "Airspace Lot Owner," all owners of such condominium units will act and be treated collectively through the Association under this Agreement and each owner of a condominium unit, by taking title to

---

[1] The RECA defines Project Improvements as "a hotel and related amenities, restaurants, a plaza area with an ice skating rink, retail space, a parking garage and skier services . . . located on the Project Lot."

3

a condominium unit, irrevocably and unconditionally appoints the Association as its duly authorized representative and attorney-in-fact for all purposes of this Agreement. Notwithstanding that the Association shall be deemed the "Airspace Lot Owner," the Airspace Lot Owner Easements will be deemed granted to the Association for the benefit of its members and the use restrictions on the Airspace Lot will apply to and may be enforced against all or any portions of the Airspace Lot and the owners thereof, as the Project Owner may elect from time to time. In any event, each owner of a portion of the Airspace Lot, whether condominiumized or not, is subject to all provisions of this Agreement.

¶ 5    The RECA established that the Airspace Lot Owner would be responsible for a flat amenity access fee set by the Project Owner and 59.7% of the operating and capital improvement costs of the Arrabelle. As the owner of both the Airspace Lot and the Project Lot, Vail Resorts signed the RECA on behalf of both owners.

¶ 6    Immediately after recording the RECA, Vail Resorts recorded a condominium plat creating sixty-six condominiums in the Airspace Lot and a condominium declaration creating the Arrabelle at Vail Square Residential Condominium Association, Inc. (Association). The condominiums ultimately sold with base prices ranging from $1,195,000 to $6,695,000.

¶ 7    Problems arose between Vail Resorts and the Association within the first year of operation.  While the RECA required the Association to pay a $1,975,853 expense payment in 2008, the Association objected.  And because the 2008 Arrabelle operations ran substantially over budget, the Association was facing yet a larger expense payment in 2009.  On February 17, 2009, the Association notified Vail Resorts it was terminating the RECA.

¶ 8    On June 1, 2009, the Association filed this action seeking a declaratory judgment allowing it to terminate the RECA or alternatively ruling that the RECA was in violation of CCIOA, requiring reformation.  The Association made additional claims for statutory breach of good faith, breach of fiduciary duties, and breach of the common law duty of good faith and fair dealing.  Vail Resorts counterclaimed for breach of contract and unjust enrichment.

¶ 9    The case proceeded in three phases.  First, the trial court granted the Association's motion for partial summary judgment, ruling that the Arrabelle is not a CCIOA small planned community under section 38-33.3-116(2) because it was subject to development

rights.  *See* § 38-33.3-116(2) ("If a . . . planned community created in this state on or after July 1, 1998, contains . . . no more than twenty units and is not subject to any development rights, it is subject only to sections 38-33.3-105 to 38-33.3-107[, C.R.S. 2015,] . . . .").

¶ 10    Second, the court conducted a trial addressing the method of reforming the RECA to comply with CCIOA (Phase I Trial).  Under sections 38-33.3-112 and -203, C.R.S. 2015, the court struck the amenity access fee from the RECA and reformed the agreement to include, among other things, mandatory alternative dispute resolution.  *See* § 38-33.3-124, C.R.S. 2015 (dispute resolution under CCIOA).  The court also concluded that the RECA included an incorrect cost allocation ratio (allocating 59.7% to the residences in the Airspace Lot and 40.3% to the Project Lot) and readjusted the burden to 49.1% to the Airspace Lot residences.

¶ 11    The court also ordered the parties to draft and ratify a master association declaration.  § 38-33.3-220.  Because the parties were unable to agree on a declaration after approximately one year, the court referred the matter to a special master who drafted a third

6

amendment to the RECA incorporating the court's changes along with articles of incorporation and bylaws for a new master association. The court adopted the special master's recommended instruments in July 2014.

¶ 12    Third, the trial court held a trial on the remaining claims of breach of good faith, breach of contract, and unjust enrichment (Phase II Trial). Ultimately, the court denied all outstanding claims and awarded the Association, as the prevailing party, $2,500,000 in stipulated attorney fees.[2]

_____

[2] The trial court adopted the Association's proposed findings for the Phase I Trial order and Vail Resorts' proposed findings for the Phase II Trial order. This has caused conflict among the findings of the court and resulted in each party relying almost exclusively on its own findings on appeal. However, because the court noted on the first day of the Phase II Trial that "[t]o the extent I made a ruling, that's binding. And while you might argue in your proposed findings that I made erroneous conclusions in my first order . . . [t]o the extent I made rulings . . . they're done," we look to the Phase I order as the definitive law of the case. Indeed, the Phase II order states:

> [T]his Court reaffirms its prior determination
> that [Vail Resorts'] development scheme has
> systemic flaws, which were further analyzed in
> the Phase I order. . . . Here in the Phase II
> Order, the Court denie[s] all the claims and
> counter-claims of both parties which effectively

¶ 13    Vail Resorts appeals the following trial court rulings: (1) the conclusion that the Arrabelle is not a "small planned community" under CCIOA section 38-33.3-116(2) because Vail Resorts reserved development rights under the RECA; (2) the reformed cost allocation based on the court's conclusion that the RECA violated CCIOA section 38-33.3-207(2), C.R.S. 2015, because the original allocation discriminated "in favor of units owned by the declarant"; and (3) the adopted reformed RECA and master association documents because those documents contain terms not required by CCIOA. The Association conditionally cross-appeals the court's conclusion that the Association did not validly terminate the RECA by e-mailing notice of termination to Vail Resorts under CCIOA section 38-33.3-305, C.R.S. 2015.

## II. Standard of Review

¶ 14    Statutory interpretation is a question of law that we review de novo. *Triple Crown at Observatory Vill. Ass'n v. Vill. Homes of Colo., Inc.*, 2013 COA 150M, ¶ 10. Because a court's primary duty is to

---

leave[s] only that relief granted in the Phase I
Order as the law of the entire case.

8

give full effect to the General Assembly's intent, interpretation begins by examining the statute's plain language within the context of the statute as a whole. *Id.* "Words and phrases should be given effect according to their plain and ordinary meaning . . . ." *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 422 (Colo. 1991). The court "must not strain to give language other than its plain meaning, unless the result is absurd." *Colo. Dep't of Soc. Servs. v. Bd. of Cty. Comm'rs*, 697 P.2d 1, 18 (Colo. 1985), *superseded by statute on other grounds*, Ch. 58, 1985 Colo. Sess. Laws 289-90.

¶ 15 CCIOA is patterned after the Uniform Common Interest Ownership Act (UCIOA), and "we accept the intent of the drafters of a uniform act as the General Assembly's intent when it adopts a uniform act." *Yacht Club II Homeowners Ass'n v. A.C. Excavating*, 94 P.3d 1177, 1180 (Colo. App. 2003), *aff'd*, 114 P.3d 862 (Colo. 2005).

III. CCIOA's Small Planned Community Exception

¶ 16 CCIOA provides in pertinent part that "[i]f a . . . planned community created in this state on or after July 1, 1998, contains . . . no more than twenty units and is not subject to any

9

development rights, it is subject only to sections 38-33.3-105 to 38-33.3-107 . . . ." § 38-33.3-116(2).

> "Development rights" means any right or combination of rights reserved by a declarant in the declaration to:
>
> (a) Add real estate to a common interest community;
>
> (b) Create units, common elements, or limited common elements within a common interest community;
>
> (c) Subdivide units or convert units into common elements; or
>
> (d) Withdraw real estate from a common interest community.

§ 38-33.3-103(14), C.R.S. 2015. "'Common interest community' means real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." § 38-33.3-103(8). A "'[d]eclarant' means any person or group of persons acting in concert who: . . . [r]eserves or succeeds to any special declarant right." § 38-33.3-103(12)(b); *see* § 38-33.3-103(21) ("'Person' means . . . a corporation . . . ."). And "'[s]pecial declarant

rights' means rights reserved for the benefit of a declarant to . . . exercise any development right." § 38-33.3-103(29).

¶ 17    The provisions of CCIOA "may not be varied by agreement, and rights conferred by this article may not be waived.  A declarant may not act under a power of attorney or use any other device to evade the limitations or prohibitions of this article or the declaration." § 38-33.3-104, C.R.S. 2015.

## A. Development Rights

¶ 18    In granting the Association's motion for partial summary judgment, the trial court concluded that section 19 of the RECA reserved the right to condominiumize the Airspace Lot and, therefore, reserved a development right in Vail Resorts as defined by section 38-33.3-103(14).  By using plain language indicating the existence of a future right — "the Airspace Lot Owner may, at its election, subject the Airspace Lot to a condominium regime" — Vail Resorts reserved the right to create within the Airspace Lot a common interest community in which physical portions thereof would be designated for separate ownership.  § 38-33.3-103(8) (defining common interest community); § 38-33.3-103(9) (defining

11

condominium). These separately owned physical portions of the Airspace Lot would be units. § 38-33.3-103(30) ("'Unit' means a physical portion of the common interest community which is designed for separate ownership . . . ."). Therefore, the plain language of the RECA allowed Vail Resort to "[c]reate units . . . within a common interest community." § 38-33.3-103(14). Consequently, the court concluded the RECA subjected the Airspace Lot to "development rights" precluding the Arrabelle from becoming a small planned community.

¶ 19 Vail Resorts argues that the Arrabelle is a small planned community because (1) UCIOA section 4-103(b) (Unif. Law Comm'n 1982) establishes that CCIOA does not consider the ability to create nested common interest communities as development rights; (2) the UCIOA requires that a development right alter the legal structure of an existing common interest community and the condominiumization of the Airspace Lot did not alter the Arrabelle's legal structure; and (3) the RECA did not reserve any development rights in the "declarant" but rather in the "Airspace Lot Owner,"

12

who coincidentally happened to be the declarant in these circumstances.

¶ 20    Vail Resorts relies upon UCIOA section 4-103(b) (a section that was not adopted in CCIOA) to support an argument that although a declarant may reserve a power to place one common interest community inside another, such a power is not a development right.  That section provides:

> If a common interest community composed of not more than 12 units is not subject to any development rights and no power is reserved to a declarant to make the common interest community part of a larger common interest community, group of common interest communities, or other real estate, a public offering statement may but need not include the information otherwise required by paragraphs (9), (10), (15), (16), (17), (18), and (19) of subsection (a) and the narrative descriptions of documents required by subsection (a)(4).

UCIOA § 4-103(b) (Unif. Law Comm'n 1982).

¶ 21    We reject this argument for three reasons.  First, UCIOA section 4-103(b) deals not with development rights but with disclosure requirements and exempts a declarant from making certain disclosures where the common interest community is small

13

and the declarant has no power to attach it to another community that would result in a common interest community of more than twelve units. It does not alter CCIOA's definition of development rights.

¶ 22     Second, it is apparent here that Vail Resorts did in fact have the power to expand the size of the Arrabelle. It created a common interest community in the Airspace Lot and, in doing so, quite obviously exercised a power reserved in the RECA. That it now chooses to describe that power as something other than a development right is a distinction without a difference.

¶ 23     Third, the creation of sixty-six condominiums would not allow a declarant to qualify for an exemption under the small planned community provision of UCIOA section 4-103(b) in any case. We can find no provision in either CCIOA or UCIOA for the creation of an "air lot" above an existing real estate footprint that can contain a large number of condominiums amalgamated as a single "unit" that would qualify as a small planned community. In our view this violates the letter and the spirit of CCIOA's definition of

14

development rights and, consequently, we discern no error in the trial court's conclusion to that effect.

¶ 24     The reservation of the right to establish a second common interest community within the boundaries of an existing common interest community is far more akin to the ability to create units under section 38-33.3-103(14)(b) than the unadopted exclusion contained in UCIOA section 4-103(b).

¶ 25     Vail Resorts also contends that under CCIOA a development right must alter the legal structure of the existing common interest community. Because RECA section 19 only allows for the creation of a new common interest community within the existing legal structure of the Arrabelle, Vail Resorts argues section 19 did not reserve a development right. We disagree.

¶ 26     UCIOA section 2-105 comment 1 (Unif. Law Comm'n 1982) states in pertinent part:

> This Act makes a functional distinction between the declaration and the public offering statement. It only requires the declaration to contain *those matters which affect the legal structure or title* of the common interest community. This includes the reserved powers of the declarant to exercise development rights within the common interest community. A

15

> narrative description of those rights, however, and the possible consequences flowing from their exercise, are required to be disclosed only in the public offering statement and not in the declaration.

(Emphasis added.)

¶ 27    Relying on this comment, Vail Resorts argues RECA section 19 does not allow the new condominium community in the Airspace Lot to affect the legal structure of the Arrabelle. But Vail Resorts completely glosses over the next two words — "or title" — in the comment. When Vail Resorts subjected the Airspace Lot to condominiumization, it sold units to individuals who then gained title to that property. Even ignoring the individual condominiums, the common interest community within a common interest community development still resulted in the Association becoming the owner of the Airspace Lot, thereby affecting the title of the Arrabelle.

¶ 28    Moreover, UCIOA section 2-105 addresses those matters that must be contained in a declaration; it is not a clear definition of development rights. Instead, UCIOA section 1-103 comment 13 (Unif. Law Comm'n 1982) expressly defines development rights:

"Development rights," includes a panoply of sophisticated development techniques that have evolved over time throughout the United States and which have been expressly recognized and regulated in the case of condominiums, in an increasing number of jurisdictions, beginning with Virginia in 1974.

The concept of "development rights" lies at the heart of one of the principal goals of the Act, which is to maximize the flexibility available to a developer seeking to adjust the size and mix of a project to the demands of the marketplace, both before and after creation. The principal constraint on that flexibility is the obligation of disclosure, and its impact on marketing. Thus "development rights" include the rights to:

(a) increase the size or density of a project, either by adding real property to it, or by creating new units, common elements or limited common elements on either the original land or within the original buildings, or on any other land or buildings subsequently added;

(b) change the mix of units, common elements and limited common elements, either by subdividing units, or by converting units into common elements or limited common elements; and

(c) reduce the size of a project by withdrawing real property — whether land, entire buildings, or particular units — from it.

As a matter of simple logic, there are few other things that could be done to a real property regime which are not include [sic] within the concept of development rights. This great

17

flexibility, particularly when coupled with the broad definitions of "unit" and "real estate", the power to create leasehold projects, and the right to subordinate unit mortgages to blanket mortgage on either the units or common elements, is an important element in the Act.

. . . .

The right "to create units, common elements, or limited common elements" has frequently been useful in the case of commercial or mixed use common interest communities, where the declarant needs to retain a high degree of flexibility to meet the space requirements of prospective purchasers who may not approach him until the common interest community has already been created. For example, an entire floor of a high-rise building may be intended for commercial buyers, but the declarant may not know in advance whether one purchaser will want to buy the whole floor as a single unit or whether several purchasers will want the floor divided into service [sic] units, separated by common element walls and served by a limited common element corridor. This development right is sometimes useful even in purely residential common interest communities, especially those designed to appeal to affluent buyers. Similarly, the development rights "to subdivide units or convert units into common elements" is most often of value in commercial common interest communities, but may be useful in certain kinds of residential common interest communities as well.

¶ 29    Section 19 of the RECA allows Vail Resorts to "increase the . . . density of [the] project . . . by creating new units . . . on . . . the original land." UCIOA § 1-103 cmt. 13 (Unif. Law Comm'n 1982). Thus, the condominiumization of the Airspace Lot was a development right.

¶ 30    Vail Resorts next argues the RECA reserved the condominiumization of the Airspace Lot to the "Airspace Lot Owner," not the "declarant," and, therefore, it is not a development right. The creativeness of this argument does not further Vail Resorts' position. Ultimately, when the RECA was drafted, Vail Resorts was both the declarant and the Airspace Lot Owner. Section 38-33.3-103(31) states in pertinent part that a "'[u]nit owner' means the declarant or other person who owns a unit . . . . In a . . . planned community, the declarant is the owner of any unit created by the declaration until that unit is conveyed to another person."

¶ 31    The RECA was created by Vail Resorts, which owned both the Airspace Lot and the Project Lot, and was signed on behalf of "both owners" by the same individual. To split hairs so finely as Vail

19

Resorts would have us do would lead to an absurd result where a declarant, simply by titling itself as "Unit Owner," could circumvent the clear intent of section 38-33.3-116(2) to exclude planned communities with development rights from the small planned community exception to CCIOA. *See* UCIOA § 1-103 cmt. 24 (Unif. Law Comm'n 1982) ("The definition makes it clear that a declarant, so long as he owns units in a common interest community, is the unit owner of any unit created by the declarations, and is therefore subject to all of the obligations imposed on other unit owners, including the obligation to pay common expense assessments.").

¶ 32     RECA section 19 provides "that the Airspace Lot Owner may, at its election, subject the Airspace Lot to a condominium regime under CCIOA." When executed, the Airspace Lot Owner was the declarant creating the declaration reserving the right to condominiumize. Therefore, the declarant was reserving the right to create units in the common interest community and that community was subject to development rights. § 38-33.3-116(2); *see* § 38-33.3-103(14)(b), (29). Accordingly, the Arrabelle is not a small planned community.

## B. Number of Units

¶ 33    The Association alternatively argues on appeal that we may affirm the decision of the trial court because the Arrabelle contains more than twenty units. § 38-33.3-116(2) (a small planned community contains no more than twenty units); *see Taylor v. Taylor*, 2016 COA 100, ¶ 31 ("An appellate court may . . . affirm on any ground supported by the record."). The Association and Vail Resorts disagree about how to quantify the number of units in the Arrabelle.

¶ 34    Vail Resorts argues that RECA section 18 establishes only two lots for purposes of section 38-33.3-116(2): "The planned community created by this Agreement contains only two lots, the Project Lot and the Airspace Lot, and is therefore exempt from CCIOA's provisions pursuant to the exemption contained in section 38-33.3-116(2) of CCIOA for planned communities containing no more than 20 lots." Therefore, Vail Resorts argues that when it created the condominium units under the separately filed condominium declaration, it did not alter the two unit structure of the Arrabelle.

¶ 35     On the other hand, the Association argues that CCIOA does

not provide for the separate consideration of units within a single

planned community based on separate declarations filed by the

declarant.  *See* § 38-33.3-103(13) ("'Declaration' means any

recorded instruments however denominated, that create a common

interest community, including any amendments to those

instruments and also including, but not limited to, plats and

maps."); Lynn S. Jordan et al., *The Colorado Common Interest

Ownership Act*, 21 Colo. Law. 645, 650 (Apr. 1992) ("Under CCIOA,

a declaration includes not only the recorded document entitled

'declaration,' setting forth covenants, conditions and restrictions,

but also all recorded maps, plats and plans or any combination

thereof.").  Instead, the Association suggests that all separately

owned physical portions within a planned community should be

counted together for purposes of the small planned community

exception.  *See* § 38-33.3-103(30) (defining unit).

¶ 36     We agree with the Association.  Reading CCIOA as a whole it is

apparent that the General Assembly intended a "clear,

comprehensive, and uniform framework for the creation and

22

operation of common interest communities." § 38-33.3-102(1)(a), C.R.S. 2015 (CCIOA legislative declaration). The small planned community exception, section 38-33.3-116, is meant to remove communities with fewer than twenty units and no development rights from this "clear, comprehensive, and uniform framework." It is the exception, not the rule.

¶ 37 The General Assembly intended for most common interest communities to be bound by CCIOA and for developers to have "flexible development rights *with specific obligations* within a uniform structure of development of a common interest community." § 38-33.3-102(1)(c) (emphasis added). Allowing Vail Resorts to use multiple levels of declarations to avoid those specific obligations through a hyper-technical interpretation of CCIOA violates the purpose and the spirit of the statute. Furthermore, a developer "may not . . . use any . . . device to evade the limitations or prohibitions of this article" and the "rights conferred by this article may not be waived." § 38-33.3-104. Were we to accept Vail Resorts' interpretation of CCIOA, we would be supporting a legal

fiction intended to evade the limitations and prohibitions of CCIOA.[3] The General Assembly has expressly disavowed this approach.

¶ 38     The Arrabelle contains a hotel, retail shops, restaurants, parking, a spa, an ice-skating rink, and sixty-six condominiums. This, by common definition, is not a "small planned community." And by statutory definition, we conclude the Arrabelle contains sixty-seven units (the Project Lot owned by Vail Resorts and sixty-six condominiums whose physical portion of the common interest community is designed for separate ownership). We perceive no language in CCIOA to support Vail Resorts' argument that the fact that these units were created by two declarations should preclude their consideration for the total number of units within a single planned community.

¶ 39     Nor are we concerned that this conclusion requires reversing the trial court as suggested by Vail Resorts. After the Phase I Trial,

---

[3] Counsel responsible for drafting the RECA gave a presentation at the American Bar Association's Joint Fall Session on September 28, 2007, where she acknowledged that the RECA was intended to prevent residents from having "any say, period." When testifying at the Phase I Trial, counsel also acknowledged that the RECA used a square footage allocation model "to keep the residential owners out of the process."

the court was forced to appoint a special master to complete the reformation of the RECA and creation of a master association. The instruments adopted by the court include statements that "[t]here is hereby created a planned community . . . consisting of the Project Lot and the Airspace Lot" and "[e]ach Lot is a 'unit' as defined by the Act." There is nothing in CCIOA to suggest that the current structure of the Arrabelle as a Project Lot and Airspace Lot with sixty-six separate condominium units within the Airspace Lot is inappropriate. *See* § 38-33.3-103(22) ("A condominium or cooperative may be part of a planned community."). Rather, the error would be in allowing that structure to skirt the requirements of CCIOA by hiding behind a fictional two-unit scheme. Developers are free to exercise their "flexible development rights" so long as they respect the "specific obligations" of CCIOA. § 38-33.3-102(1)(c). Hence, a developer may create a common interest community that has multiple declarations creating planned communities and condominium communities,[4] but a court may

---

[4] For example, Highlands Ranch, Colorado, a town of 96,000 people, is a common interest community covered by CCIOA. Highlands Ranch Metro District, https://perma.cc/VU94-8N8Y;

25

consider all the units within that common interest community in determining whether the small planned community exception to CCIOA applies. *See* § 38-33.3-103(8) (common interest community); § 38-33.3-103(9) (condominium); § 38-33.3-103(22) (planned community); § 38-33.3-103(30) (unit); § 38-33.3-116 (small planned community exception).

¶ 40    In short, because the Arrabelle contains a total of sixty-seven units, it is not a small planned community containing fewer than twenty units under section 38-33.3-116(2).

## IV. Reformation of the RECA

¶ 41    After determining that the Arrabelle was not a small planned community, the court conducted the Phase I Trial to determine how to reform the RECA to comply with CCIOA.

¶ 42    Part of the trial focused on whether the cost allocation provision of the RECA violated CCIOA section 38-33.3-207(2), which requires that cost "allocations may not discriminate in favor of units owned by the declarant or an affiliate of the declarant." Ultimately, the court concluded that while the square footage mechanism to

---

Highlands Ranch Community Association, Governing Documents, https://perma.cc/4HAG-RQUT.

determine cost allocation listed in the RECA was appropriate, the original cost allocation of 59.7% to the Association was based upon "square footage calculations pulled from various maps and tables prepared long before the Arrabelle was constructed," which discriminated in favor of Vail Resorts. Therefore, the court accepted the calculations of the Association's expert who used as-built drawings to calculate square footage, resulting in a 49.1% allocation to the Association.

¶ 43 The remainder of the Phase I Trial focused on how to reform the balance of the RECA. The court ordered the parties to create a master association, § 38-33.3-220, strike the amenity access fee in the cost allocation provision, § 38-33.3-207, adjust utility costs, § 38-33.3-315, C.R.S. 2015, and consent to binding arbitration, § 38-33.3-124.

## A. Cost Allocation

¶ 44 Section 6(b) of the RECA states:

> Each calendar year, the Airspace Lot Owner will pay to the Project Owner a portion, calculated as provided for below (the "Expense Payment"), of the operating, maintenance, utility, employee and other expenses related to the ongoing ownership, operation and

maintenance of the Project Improvements, including, without limitation, the Amenities, and related off-site improvements and facilities to the extent the responsibility of the Project Owner (the "Operating Costs"). The Operating Costs in no event will include any costs solely attributable to an income-generating portion of the Project Improvements for which the Airspace Lot Owner has access to or use of by virtue of being a member of the public, and not due to the Airspace Lot Owner's rights under this Agreement, such as, by way of example only, any restaurant or retail shop within the Project Improvements, all as determined by the Project Owner in its ordinary business judgment. The Parties acknowledge and agree that the Expense Payment is also intended to compensate the Project Owner for, among other things, the cost of all utility services provided to the Airspace Lot as part of the utility service provided to the Project Improvements, but not separately metered, and the cost of valet service. Each year's Expense Payment will be comprised of two components: (a) a flat fee intended to cover the Airspace Lot Owner's share of all Operating Costs related to the Amenities (the "Amenity Access Fee"); and (b) 59.7% of the "Estimated Annual Operating Costs" (as defined below), which percentage the parties acknowledge and agree is based on the approximate square footage of the Airspace Improvements[5] divided by the sum of the approximate square footage of the Airspace Improvements and the Project

---

[5] "Airspace Improvements" are defined in the RECA as "a combination of residential dwellings and individual sleeping rooms attached to some of the residential dwellings."

28

Improvements, excluding the square footage of the parking garage and loading and delivery facility within the Project Improvements and is not subject to adjustment based on remeasurement or otherwise. The Amenity Access Fee is initially established at $167,500 per year, but may be increased from time to time by the Project Owner in its ordinary business judgment based upon circumstances then prevailing. The Parties acknowledge and agree that the Amenity Access Fee is a flat fee in lieu of calculating the Airspace Lot Owner's share of those portions of the Operating Costs related to operating the Amenities, and the Estimated Annual Operating Costs do not include any costs related to operating the Amenities, as determined by the Project Owner in its ordinary business judgment. The Parties acknowledge and agree that there is no operational history upon which to base the first year's Expense Payment and, based upon estimated costs, the parties have determined that from the date of this Agreement through December 31, 2008, the Airspace Lot Owner's annual Expense Payment will be $1,975,853, prorated based upon a 365-day year. Each calendar year thereafter, prior to the start of the calendar year, the Project Owner will develop a budget estimating the total amount of the year's Operating Costs (excluding Operating Costs for the Amenities) anticipated to be incurred by the Project Owner in that calendar year (the "Estimated Annual Operating Costs"). At any time, the Project Owner may cease charging the Amenity Access Fee and, upon such event, may include all Operating Costs related to the Amenities in the Estimated Annual Operating Costs and the

Airspace Lot Owner will pay its percentage share of such costs as part of the Expense Payment. The Airspace Lot Owner will pay each Expense Payment without demand or set-off, in equal installments due on the first day of each calendar quarter in such calendar year. Any failure or delay of the Project Owner in establishing or updating the amount of the Expense Payment for any calendar year will not be deemed a waiver, modification, or release of the right to so establish or update those installments, or of the obligation of the Airspace Lot Owner to pay installments of an Expense Payment prospectively.

¶ 45 The court made several interrelated conclusions affecting the expense payment due by the Association. First, the court concluded that "the [Vail Resorts]-owned facilities in which residential owners are granted an easement function as CCIOA-defined common elements." Second, the "59.7% square-footage ratio was calculated without any reference to the RECA" or the formula set forth in section 6(b). Third,

the data relied upon by [a Vail Resorts employee to establish the 59.7%] does not take into account over 70,000 square feet of building space . . . [and] contrary to the RECA formula, [Vail Resorts] excluded from this ratio several other areas of the Project Improvements such as the plaza and skating rink. By removing the square footage for these substantial areas of the Project Improvements

from the total (all of which are owned by [Vail Resorts]), [Vail Resorts] inflated the rate by which costs are allocated to the Association.

¶ 46 And fourth, "the [Vail Resorts'-]derived 59.7% is not supported by the evidence as being a fair representation of how the Project Space and the Airspace is allocated between the parties and . . . such analysis by [Vail Resorts] discriminates in favor of [Vail Resorts] at the expense of the Association."

¶ 47 Under CCIOA, "[t]he declaration must state the formulas used to establish allocations of interest. Those allocations may not discriminate in favor of units owned by the declarant or an affiliate of the declarant." § 38-33.3-207(2).

¶ 48 Vail Resorts contends the court erred in its interpretation because the RECA favors the Project Owner, not the declarant, in allocating 59.7% of costs to the Association. This is a similar argument to the one Vail Resorts made regarding the Airspace Lot Owner reserving the right to develop rather than the declarant. The fact remains that Vail Resorts is both the declarant and the Project Owner. Thus, when the Project Owner (Vail Resorts) discriminated in favor of itself by shifting approximately 60% of its costs to the

Association while in actuality owning approximately 50.9% of the Arrabelle, the declarant (Vail Resorts) was also doing so.

¶ 49     Vail Resorts relies on the amended UCIOA section 2-107 comment 10 (Unif. Law Comm'n 2008), which interprets the 1982 UCIOA, to support its position that the RECA does not discriminate in its favor:

> Questions have arisen concerning the drafters' intent regarding the language in subsection (b), which prohibits the declaration in allocating votes and common expense liabilities among the units, from "discriminating in favor of units owned by the declarant." Specifically, the question is whether this section imposes a special level of scrutiny on the allocation of votes and common expense liability to units that the declarant may own, compared to similar units that are owned by persons who are not declarants.
>
> The answer is that the language means what it says: that is, if the allocated interests would change at the time the declarant sold the unit, then the allocated interests are improper because they discriminate in favor of the declarant's ownership of that unit. However, if the allocation of common expenses and votes is permanent rather than dependent on the owner's identity and one whose formula is identified in the declaration, then the allocation is proper. Subject to the obligations of good faith in Section 1-113 and the

32

prohibition on unconscionable terms in Section 1-112, this would be true even if the effect of the allocation were to create a relative benefit in favor of units that the declarant or its affiliates intend to own for an indefinite period.

¶ 50     To be sure, this comment suggests that as long as the Project Owner always benefits from the unfair allocation of costs between itself and the Airspace Lot Owner, the allocation is "proper." However, the court not only determined that the cost allocation discriminated in favor of Vail Resorts because Vail Resorts excluded significant portions of the Project Lot from the cost allocation formula but also because the "59.7% square-footage ratio was calculated without any reference to the RECA" or the formula set forth in section 6(b).  Consequently, the allocation of 59.7% in RECA section 6(b) violates the first sentence of section 38-33.3-207(2) because the allocation did not match "the formulas used to establish allocations of interests."

¶ 51     Moreover, the example in comment 10 goes on to describe a scenario which highlights how the RECA discriminates in favor of Vail Resorts.

33

A common interest community consists of a high-rise building containing 10 floors of equal size. There are 4 units on each floor except the top floor, where there is one 1 'penthouse' unit. Even though the penthouse unit is four times the size of the units on the 9 other floors, and is clearly more valuable than the other 36 units, the declaration allocates an equal share of the common expenses to all the units, including the penthouse unit. The effect of this allocation is that the penthouse unit bears a 1/37th share of the common expenses — this is only 25% of the cost on a per square foot basis — of the share borne by each unit owner on a lower floor.

*Assume that the declaration properly contains the formula used for the allocation of common expenses among the units and properly discloses the material and unusual circumstances that the penthouse benefits substantially from the formula used to allocate expenses.*

The fact that the declarant intends to retain ownership of the penthouse unit and live in that unit for an indefinite period does not mean that the standard contained in section 2-107(b) has been violated. However, the Act would be violated if the declaration provided that, upon the declarant's sale of the penthouse, the formula for allocating common expenses would be changed to an allocation among all the units based on their relative sizes.

In the example, this appears to yield an unjust result and *a court might be invited to consider the extent to which the declarant had acted in*

*bad faith or unconscionably in making such an allocation.* Nevertheless, any other rule would simply encourage challenges to any allocation of common expenses, since an argument can always be made that any allocation — whether done on relative size, number of rooms, "value", location within a building, equality or any other basis — inevitably works to the relative disadvantage of some owners compared to others in the same community.

UCIOA § 2-107 cmt. 10 (Unif. Law Comm'n 2008) (emphasis added).

¶ 52    Here, the RECA's 59.7% allocation did not match "the formula used for the allocation of common expenses among the units" and did not "properly disclose[] the material and unusual circumstances" that Vail Resorts "benefit[ed] substantially from the formula used to allocate expenses." This lack of transparency supports the court's conclusion that section 6(b) was "unconscionable under CCIOA § 112"[6] and discriminated in favor of units owned by Vail Resorts.

---

[6] Vail Resorts argues the trial court repudiated this finding in its Phase II Trial order. However, as we noted in footnote 2, the court did not revisit its earlier conclusions in the Phase II Trial. Instead, the Phase II Trial focused on the remaining claims and involved different evidence than the Phase I Trial. Accordingly, the trial court's conclusion in the Phase I Trial order that RECA section 6(b) was unconscionable under section 38-33.3-112, C.R.S. 2015, is appropriate and valid.

35

¶ 53    Because the 59.7% cost allocation to the Association did not

correspond to the formula established in RECA section 6(b), and

because that allocation discriminated in favor of Vail Resorts'

Project Lot without properly disclosing that the allocation

substantially benefitted that lot, we discern no error in the trial

court's conclusion to reform RECA section 6(b) pursuant to the

Association's expert's recommendation based on as-built drawings

of the Arrabelle.

## B. Additional Reformations

¶ 54    The court ordered additional reformations to the RECA and

the creation of a master association under section 38-33.3-220.

Vail Resorts argues these actions exceeded the authority of the

court.  We disagree.

¶ 55    "The principles of law and equity . . . supplement the

provisions of this article . . . ."  § 38-33.3-108, C.R.S. 2015.

> The court, upon finding as a matter of law that
> a contract or contract clause relating to a
> common interest community was
> unconscionable at the time the contract was
> made, may refuse to enforce the contract,
> enforce the remainder of the contract without
> the unconscionable clause, or limit the

36

> application of any unconscionable clause in order to avoid an unconscionable result.

§ 38-33.3-112(1). "The remedies provided by this article shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." § 38-33.3-114(1), C.R.S. 2015.

¶ 56    "Reformation is an equitable remedy within the trial court's discretion." *Davis v. GuideOne Mut. Ins. Co.*, 2012 COA 70M, ¶ 57; *see CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011) ("The power to reform contracts (as contrasted with the power to enforce contracts as written) is a traditional power of an equity court, not a court of law, and was used to prevent fraud."); Restatement (Third) of Property: Servitudes § 6.3 cmt. a (Am. Law Inst. 2000) ("The judicial power to authorize creation of an association is that of a court of equity with its attendant flexibility and discretion to fashion remedies to correct mistakes and oversights and to protect the public interest."). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Landmark Towers Ass'n v. UMB Bank, N.A.*, 2016 COA 61, ¶ 31.

¶ 57     At the conclusion of the Phase I Trial, the court ordered that "[i]f the parties are unable to draft or ratify a declaration without the Court's assistance, this matter will be referred to a special master of the Court's choosing, who will draft a declaration that shall, subject to the Court's approval, be adopted as an Order of the Court."  The court similarly noted that "[i]f the parties cannot agree on how to allocate . . . utility costs without the Court's assistance, the matter will be referred to a special master of the Court's selection," and "[i]f the parties cannot agree on how to allocate . . . recalculated costs without the Court's direction . . . the matter will be referred to a special master of the Court's selection."  Because the parties could not agree *after a year*, the court appointed a special master (recommended by Vail Resorts) who drafted the master association declaration and reforms to the RECA.

¶ 58     Vail Resorts specifically challenges the court's reformations on parking, lobby expenses, utility costs, and mandatory arbitration. Parking, lobby, and utility costs all stem from RECA section 6(b), which the court concluded violated CCIOA section 38-33.3-207(2) and was unconscionable under section 38-33.3-112.  These

conclusions supported reformation of the RECA. The court then attempted the fairest approach to reformation by looking at the requirements of CCIOA for guidance. *See* § 38-33.3-124 (alternative dispute resolution); § 38-33.3-315 (utilities). Indeed, the court simply placed Vail Resorts and the Association in the position they would have been had Vail Resorts initially created a CCIOA-compliant common interest community. While the ultimate reforms may have been based on permissive, rather than mandatory, terms recommended by CCIOA, we perceive no error in the court adopting those terms.

¶ 59 We also reject Vail Resorts' argument of overreaching insofar as it relies on *Hauer v. McMullin*, 2015 COA 90 (*cert. granted* Mar. 21, 2016). In *Hauer*, the question was whether several recorded documents could satisfy CCIOA's requirement that common interest communities be formed by an assessment obligation described in a declaration. ¶ 27. The division, without citation to authority, stated that "[w]e reiterate the trial court's conclusion that courts do not have the power to create an agreement for the members of a

homeowners association, or to create an association's operational infrastructure." ¶ 30.

¶ 60 First, CCIOA section 38-33.3-108 allows a court to use principles of law and equity to supplement CCIOA; this includes the court's ability to create an association under certain circumstances. Indeed, the division in *Hauer* quoted the Restatement (Third) of Property: Servitudes section 6.2 comment c (Am. Law Inst. 2000), that "an association may be created . . . by a court under certain circumstances." ¶ 20.

¶ 61 Second, the trial court in *Hauer* added a provision to the documents creating an implied common interest community; the court created the fractional interest of the common expenses for which each lot owner was responsible. ¶ 24.

¶ 62 Third, the quoted statement is not integral to *Hauer*'s conclusion and is, therefore, dicta. *See Hardesty v. Pino*, 222 P.3d 336, 340 (Colo. App. 2009) ("[D]ictum does not become law of the case.") (citation omitted).

¶ 63 And while Vail Resorts argues the trial court substituted its judgment for the judgment of the parties, we note the only party to

the original RECA was Vail Resorts itself. While the Association became the Airspace Lot Owner, there was never any initial agreement between Vail Resorts and the Association that the court disregarded. Moreover, the Association and Vail Resorts, having been afforded one year to resolves this matter, were unable to agree on reformations to the RECA. The litigation in this case had been ongoing for four years and the court had yet another phase of trial to conduct. *See People v. Sandoval-Candelaria*, 2014 CO 21, ¶ 26 ("[O]ur cases make clear that trial courts have broad discretion to manage their dockets."). We conclude that principles of equity support the trial court's conclusion that these reformations were necessary for the RECA to comply with CCIOA, and we discern no abuse of discretion on the part of the trial court in appointing a special master and adopting his reformations.

## V. Conditional Cross-Appeal and Attorney Fees

¶ 64 Because we do not set aside any of the court's reformations, we do not address the Association's conditional cross-appeal seeking a determination that the Association validly terminated the RECA by e-mail notice to Vail Resorts in February 2009.

41

¶ 65    Pursuant to C.A.R. 39.1 and RECA section 21, we award the Association the stipulated $300,000 in attorney fees for this appeal.

## VI. Conclusion

¶ 66    The judgment is affirmed.

JUDGE BOORAS and JUDGE MÁRQUEZ concur.